Filed 7/26/23  In re M.P. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re M.P., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.D., <br><br> Defendant and Appellant. | A166036 <br><br> (Sonoma County Super. Ct. No. DEP-5306-02) |

Minor M.P. is a 17 year old with autism who was the subject of a prior dependency petition with sustained allegations of sexual abuse by her stepfather.  The Sonoma County Human Services Department (Department) initiated subsequent dependency proceedings based on that abuse and the failure to protect by M.P.'s mother (Mother).  The juvenile court bypassed reunification services to Mother in its dispositional findings and orders pursuant to Welfare and Institutions Code section 361.5, subdivision (b)(3) (section 361.5(b)(3)).[1]  Under that statute, reunification services need not be

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.  Minor's presumed father waived family reunification services and is not a party to this appeal.

1

provided to a parent if the child has been previously adjudicated a dependent as the result of sexual abuse, was originally removed from the parent's custody and later returned, and is being removed again "due to additional physical or sexual abuse."

We agree with Mother that the juvenile court erred in applying section 361.5(b)(3) here. The statute is narrowly drawn to address situations involving additional acts of abuse, after a child has been removed and returned. It does not create a scheme to end reunification services based on the speculative risk of potential future abuse. While there is no dispute regarding the sufficiency of the evidence supporting the removal of Minor from the home a second time (after stepfather returned there following a successful appeal of his parole violation), the record lacked clear and convincing evidence of additional abuse. We therefore reverse the order denying reunification services to Mother pursuant to section 361.5(b)(3).

<h2 style="text-align:center">BACKGROUND[2]</h2>

### A. *Prior Dependency Proceedings*

After serving approximately 17 years in prison for second degree murder, Minor's stepfather was released on lifetime parole in 2016. According to Mother, she and stepfather were longtime family friends and she visited him in prison every month for 10 years. After his release, they married and he moved into the family home.

Roughly a year after his release, in 2017, prosecutors charged stepfather with four counts of committing a lewd or lascivious act against Minor. (Pen. Code, § 288, subd. (a).) The Department filed a petition on

---

[2] The record in this case is extensive. This summary is not comprehensive, but rather intended to provide relevant context relating to the issue on appeal.

behalf of Minor pursuant to section 300, subdivisions (b) (failure to protect) and (d) (sexual abuse). The petition alleged, among other things, that witnesses observed stepfather inappropriately touching Minor, including "under her shirt on her breasts in a sexual manner, touching the child's bottom in a sexual manner, and having the child lay on top of him on his bare chest while kissing her on the lips." The petition further alleged that Mother did not believe the stepfather had abused Minor. At one point, Mother asked an in-home service provider not to disclose that the stepfather helped Minor shower. Minor "was able to describe sexual abuse by [stepfather] in a forensic interview which took place in her educational setting."

The juvenile court sustained the petition. After approximately three years of family reunification and family maintenance services, the court returned Minor to Mother's care and dismissed the matter. According to the Department, Mother reported that she would not have any future contact with Minor's stepfather. In March 2020, she also reported she had filed for divorce. From late 2019 through 2020, the Department received multiple general referrals of Minor to them based on concerns relating to neglect.

Meanwhile, the jury in stepfather's criminal case found him not guilty of two counts. The trial court dismissed the remaining two counts at the request of the prosecutor after the jury was unable to reach a verdict. The trial court subsequently conducted a contested parole violation hearing. It found that stepfather had violated his parole. On appeal, the parole violation was reversed due to a lack of substantial evidence to support the determination that the stepfather "acted with the intent of 'gratifying the lust and passions of [stepfather or Minor],' in violation of [Penal Code] section 288, subdivision (a)." (*People v. McNutt* (Jul. 21, 2020, A157472) [nonpub. opn.].) Stepfather then returned to the home. Mother expressed her belief

that people are mistaken about stepfather because they "just don't know what it's like to parent an[] autistic child, he did nothing wrong."

**B.** *Current Petition and Detention*

In April 2022, based on reports that Mother allowed the stepfather to move back into the home with Minor, the court issued a protective custody warrant to remove Minor. The juvenile court placed Minor at a children's home. The stepfather was indeed present at the home when Minor was removed, and Mother purportedly stated that he " 'came home about a month ago after being released from parole.' " Mother said that Minor loved stepfather, and that his return to the home was the happiest Mother "had ever seen" Minor. Mother also stated that since stepfather "won his criminal appeal, there is no reason to not allow him into the home or to leave him alone with [Minor]."

The Department filed the current petition a few days later. It alleged that Mother failed to protect Minor "from sexual abuse and/or the substantial risk of sexual abuse" by the stepfather by allowing him to return to the home and resume unsupervised care of Minor. The petition referenced the allegations sustained in 2017. It also alleged that Mother maintains stepfather "does not pose a risk" to Minor, and that Minor "is experiencing intensified symptoms of sexualized and [self-injurious] behavior at this time." Despite her earlier reports to the contrary, Mother apparently never did file for divorce.

The juvenile court found the Department made a prima facie case that Minor came within section 300 and that permitting her to remain in her Mother's custody was contrary to Minor's welfare. The court ordered Minor detained by the Department.

4

**C. *Jurisdiction and Disposition***

In its May 2022 jurisdiction/disposition report, the Department recommended that the juvenile court sustain the allegations against Mother, declare Minor a dependent, and bypass reunification services for Mother. The report detailed multiple referrals for Minor that the Department received between the dismissal of the original petition and the filing of the current petition. In October 2019, for example, Minor was reported "to have outbursts and a lot of self-injury at home and at school. Specifically, [Minor] started screaming and crying, and punched her leg about eight times." In January 2020, it was "further reported that [Minor] demonstrated a significant increase in sexualized behaviors and emotional distress," including making sexual sounds, kissing the librarian on the face, "wailing, screaming, and hitting her head with her fists." In February 2020, it was reported that "there were twelve major self-injury behaviors in the previous two weeks and the child was screaming most of the day and hit her head with a closed fist, which was not a part of her baseline behavior." In September 2020, Mother reported that Minor's self-injurious behaviors included "hitting herself with a closed fist, hitting herself in the head with an open hand, and biting herself."

Minor's teacher reported that during August and September 2021, Minor was crying and screaming every day, it then " 'got better' " and Minor "appeared to be improving" between October and December 2021, but was " 'ramping up again where she was crying every day.' " Since the Department removed Minor from the home, the teacher reported "continued behaviors of [Minor] hitting herself, but stated that overall, 'her behavior has been pretty good.' "

In its August 2022 addendum report, the Department reported that both prior to her removal from Mother's home and also while at the children's home, Minor "often will have periods of time in which she will cry, often without any known trigger. At times, she has difficulty sleeping through the night. However, these instances are improving while at [the children's home] and it has been noted that she appears to be having more 'good days,' than not." While Minor's "verbal and connection skills remain significantly low, she did make more eye contact with the undersigned than during previous contacts and was more vocal, providing two to four word sentences at times." Minor and Mother were having weekly supervised in-person visits.

The juvenile court held a contested jurisdiction and disposition hearing on August 25, 2022. The Department did not present any witnesses, but upon request, the court took judicial notice of the case file. Mother testified that the stepfather came back to the house in February 2022 to have a conversation with Mother and Minor, and Mother was "positive" that he did not "sexually assault" Minor. She testified that this was the first time Minor had contact with her stepfather since he was released from custody. Mother also testified that the stepfather did not live at the home, but in Vacaville with a friend.

The court then stated that "it's the grooming behavior that, in this case, is alarming. . . . So when he's lying on the couch without his shirt on and she's lying next to him and he's kissing and nibbling her neck, I mean, that's a grooming-type behavior." It continued: "So, again, we were all concerned that there's all this stuff going on and it's not setting off a lot of red flags for you."

At the conclusion of the evidentiary portion of the hearing, the court explained: "So in today's hearing, I felt obligated to let you know, ma'am,

6

about what I see this case is about, because I know you're kind of caught on the idea, 'Did he or did he not sexually molest my child' in the sense of digital penetration of the vagina, sexual, you know, full-penis rape type of thing. And again, I was focused more on the—what I saw in this case as the grooming behavior that could be heading toward that, and we need to cut that off."

Mother's counsel requested reunification services, arguing that the bypass provisions of section 361.5 cannot be applied by "trying to bootstrap" the sexual abuse from the prior dependency matter into the current one, and that "risk of harm" is not enough to bypass services. The Department argued that section 361.5(b)(3) did apply because "the child was previously adjudicated as a result of being—physical or sexual abuse[d]; the child had been removed from the custody of the parent pursuant to Section 361; the child was returned to the custody of the parent; and the child has now been removed again for concerns about sexual abuse."

The court responded: "All right. The Court does find jurisdiction. The Court does find that (b)(3) does apply." It noted, however, that "there's obviously no doubt that Mother loves her daughter and is devoted to her. And, you know, 30 years from now, there's only going to be really one person who wants to spend a lot of time with her, and that's Mom. [¶] So Mom's a lifelong, devoted care provider for her daughter. So, I mean, ongoing and frequent contact between Mom and her daughter is ideal." Minor's counsel stated that Mother was "stuck." "Even after everything that was said, [Mother] said '[Minor]'s happiest with me and [stepfather].'" The court replied, "And that's still her position." Minor's counsel continued, "And that's still her position. And I—and after three years of services, we haven't moved

her off that. I don't know what else we can do to move her off that and protect [Minor]."

The court concluded: "I mean, no matter what I do in the next minute, you will always be Mother, and you've heard me say how important I believe it is for you to have that ongoing contact with your daughter. And the social workers are here. But at this point in time, the court cannot order reunification services based on where we find ourselves. So there is a bypass, and we do need to have the case set for a hearing on the permanent plan."

In its written findings and orders after dispositional hearing, the court found Minor was a person described by section 300, subdivisions (b) and (d), and determined that her placement at the children's home was necessary and appropriate. It also found Mother was a person described under section 361.5(b)(3) by clear and convincing evidence, and denied reunification services. Mother now appeals.

## DISCUSSION

Mother's appeal presents a narrow issue. She does not challenge the juvenile court's finding that Minor is a person described by section 300, or its determination that Minor's out-of-home placement is appropriate and necessary. Nor does she dispute that three of the four conditions for bypass of reunification services under section 361.5(b)(3) were present here: (1) the court adjudicated Minor a dependent as the result of sexual abuse by stepfather; (2) the Department originally removed Minor from Mother's custody in 2017; and (3) the court returned Minor to Mother's custody in 2019. Instead, Mother argues that the juvenile court erred on the fourth and final condition of section 361.5(b)(3): that Minor was removed from Mother's custody again "due to additional physical or sexual abuse."

8

When a child is removed from a parent's custody, California law generally requires that the parent must be provided with family reunification services. (*In re T.R.* (2023) 87 Cal.App.5th 1140, 1148.) "Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.'" (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787.)

Specific exceptions to this rule are set forth in 361.5, subdivision (b), which are "commonly called 'bypass provisions.'" (*In re T.R.*, *supra*, 87 Cal.App.5th at p. 1148.) "Because family preservation is so important in the early stages of a dependency, the Legislature has applied to reunification services a statutory presumption and heightened standard of proof." (*Ibid.*; see also *In re Luke L. (*1996) 44 Cal.App.4th 670, 678 ["It is difficult, if not impossible, to exaggerate the importance of reunification in the dependency system"].) Specifically, the Department bears the burden of proving the exception applies, subject to a clear and convincing standard of proof. (§ 361.5, subd. (b); *In re T.R.*, at p. 1148.) If the juvenile court finds by clear and convincing evidence that a bypass provision applies, the burden then shifts to the parent to prove (again by clear and convincing evidence) that reunification services would be in the child's best interests. (*In re T.R.*, at p. 1148.) The court must deny reunification services unless the parent meets that burden. (§ 361.5, subd. (c)(2).)

Mother argues that the plain language of section 361.5(b)(3) regarding "additional physical or sexual abuse" requires a new incident of abuse, after the child has returned to the home and in addition to the incidents that prompted the juvenile court to act on the earlier petition. (See, e.g., *S.V. v. Superior Court* (2018) 28 Cal.App.5th 671, 673–674, 677 [§ 361.5(b)(3) properly applied where prior incident of physical abuse occurred in 2016 and

9

additional abuse occurred in 2018]; *In re D.F.* (2009) 172 Cal.App.4th 538, 541–542 [affirming application of § 361.5(b)(3) where prior physical abuse occurred in 1995 and additional sexual abuse occurred in 2006].) Mother contends that the potential speculative "risk" of further sexual abuse based on the stepfather's presence at the home was insufficient to trigger the bypass provision.

The Department does not appear to dispute Mother's interpretation of section 361.5(b)(3). Instead, it suggests that the juvenile court correctly applied this bypass provision by making an "implicit" finding that stepfather sexually abused Minor after they both returned to the home. While we are aware of the Department's observation that Mother "remain[s] steadfast in her beliefs about stepfather, her belief that no further services would be helpful or change her mind," and the fact that it is not clear whether Mother is able "to benefit from additional services," those are not factors that are relevant to whether the bypass provision has been triggered in the first instance.

Based on our review of the record of the August 25, 2022 hearing, the juvenile court never made a finding of additional abuse by the stepfather in the period after both had returned to the family home. Rather, before making its finding that section 361.5(b)(3) applied, the juvenile court explained it was concentrated on preventing future abuse before it took place. Specifically, the court explained that it was "focused" on stepfather's 2017 "grooming" behavior toward Minor. The court expressed concern that stepfather's behavior "could be heading toward" additional abuse, not that such additional abuse had occurred. The court's concern was an understandable inference based on the evidence at the hearing—indeed, the concern is central to the Department's ongoing intervention on Minor's

10

behalf—but it did not trigger the bypass provision to end reunification services for Mother because it was not based on evidence of additional abuse.

In essence, the Department asks us to infer that it presented clear and convincing evidence of additional sexual abuse of Minor by stepfather. We can infer a necessary finding "provided the implicit finding is supported by substantial evidence." (*In re S.G.* (2003) 112 Cal.App.4th 1254, 1260.) The question before us "is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 996.) The record does not support the inference requested here.

The Department points to reports that Minor had "an uptick in sexualized and self-harming behaviors, which were very similar to her behavioral responses during the previous occasion when her stepfather was living in the home and sexually abused her." But a closer review of the reports shows escalations and fluctuations in these behaviors since even before the original dependency petition was filed, and also during time periods when the stepfather was apparently still in custody. Recall that Minor has severe autism and cannot, at the age of 17, come close to taking care of her own most basic needs. In October 2019, approximately four months before the stepfather was released, Minor was reportedly having "outbursts and a lot of self-injury at home and at school" and had "started screaming and crying, and punched her leg about eight times." In January 2020, reports indicated that Minor had demonstrated "a significant increase in sexualized behaviors and emotional distress," including "wailing, screaming, and hitting her head with her fists."

The record also reflects several reports of Minor's relevant behavior escalating before Mother allowed any renewed contact between the stepfather

11

and Minor in 2022. Even if we assume the stepfather had contact with Minor before the date provided in Mother's testimony, the reports still showed that Minor's behavior had been both better and worse in the preceding year: her teacher reported that during August and September 2021, Minor was crying and screaming every day. Her behavior then " 'got better' " and she "appeared to be improving" between October and December 2021, but in early 2022 was " 'ramping up again where she was crying every day.' " On this record, we cannot conclude that the Department presented evidence from which a reasonable fact finder could have found it highly probable that there had been additional sexual abuse of Minor by the stepfather. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996.)

In sum, we conclude that the trial court erred on its threshold determination that the section 361.5(b)(3) bypass provision for reunification services for Mother applied here. Given this conclusion, we need not address the parties' arguments regarding whether Mother satisfied her burden to show that reunification services were in Minor's best interest. (§ 361.5, subd. (c)(2).) We do, however, note the juvenile court's acknowledgment of the importance of Mother's role in this autistic Minor's life. We also note that there are ways to tailor reunification services so as to maintain the relationship between Mother and Minor while also protecting Minor from harm.

## DISPOSITION

The juvenile court's August 25, 2022 dispositional orders are reversed only to the extent they denied reunification services to Mother pursuant to section 361.5(b)(3). The orders are otherwise affirmed. The matter is remanded with directions to the juvenile court to (1) vacate its order denying reunification services to Mother; (2) set a continued dispositional hearing at

the earliest convenient time; and (3) direct the Department to prepare a supplemental status review report.  In the absence of new evidence regarding the potential applicability of section 361.5(b)(3), or other circumstances that would permit or require the court to deny Mother reunification services, the juvenile court is directed to provide Mother with appropriate reunification services tailored as necessary and appropriate to address the circumstances that led to the removal of Minor.

_____
Markman, J.*

We concur:

_____
Stewart, P.J.

_____
Miller, J.

*In re M.P.* (A166036)

* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14